759 F.2d 1316
 18 Fed. R. Evid. Serv. 13
 UNITED STATES of America, Appellee,
v.
Paula LEWIS, Appellant.
UNITED STATES of America, Appellee,
v.
Gary DARNALL, Appellant.
UNITED STATES of America, Appellee,
v.
Terry CRAFTON, Appellant.
UNITED STATES of America, Appellee,
v.
Ross Alan MILBURN, Appellant.
UNITED STATES of America, Appellee,
v.
Marion MILBURN, Appellant.
UNITED STATES of America, Appellee,
v.
Ross E. MILBURN, Appellant.
UNITED STATES of America, Appellee,
v.
Ronald THROOP, Appellant.
UNITED STATES of America, Appellee,
v.
Paula THROOP, Appellant.
 Nos. 83-1705, 83-1721, 83-1736, 83-1899 and 83-2145 to 83-2148.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 10, 1984.
Decided March 22, 1985.
Rehearing in No. 83-1705 Denied April 30, 1985.
Rehearing and Rehearing En Banc Denied in Nos. 83-1899,
83-2145-83-2148 May 15, 1985.
 
 Leonard J. Frankel, Alan G. Kimbrell, St. Louis, Mo., Bobby McDaniel, Jonesboro, Ark., Barry A. Short, St. Louis, Mo., for appellant.
 James E. Crowe, Jr., Mitchell F. Stevens, Asst. U.S. Attys., St. Louis, Mo., for appellee.
 Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 HEANEY, Circuit Judge.
 
 
 1
 Ross Alan Milburn was convicted for maintaining a Continuing Criminal Enterprise (CCE) in violation of 21 U.S.C. Sec. 848 (1982) and for conspiracy to commit tax fraud in violation of 18 U.S.C. Sec. 371; he was sentenced to life imprisonment without parole on the former charge and a concurrent five-year sentence and a $10,000 fine on the latter. Three of Milburn's associates, Gary Darnall, Terry Crafton and Paula Lewis, were convicted on cocaine distribution and conspiracy charges in violation of 21 U.S.C. Sec. 846, and they were sentenced respectively to two consecutive ten-year terms of imprisonment, a six-year term of imprisonment, and a five-year term of imprisonment with a $5,000 fine. Finally, Ross E. and Marion Milburn (Ross Alan Milburn's parents) and Ronald and Paula Throop (Ross Alan Milburn's sister and brother-in-law) were convicted of conspiring to commit tax fraud in violation of 18 U.S.C. Sec. 371. Marion Milburn was sentenced to a year in prison and a $2,000 fine; Ross E. Milburn was sentenced to three years in prison and a $10,000 fine; Ronald Throop was sentenced to a year in prison; and Paula Throop was sentenced to four years in prison and a $5,000 fine. On appeal, each of these defendants raises multiple arguments which we consider in turn.
 
 I. ROSS ALAN MILBURN[1]
 
 2
 The principal issues Milburn raises on appeal are: (1) whether the issuance of a temporary restraining order (TRO) freezing his assets violated his sixth amendment right to counsel; (2) whether certain records, testimony, and summary exhibits were improperly admitted into evidence, (3) whether the district court improperly accepted the government's use of a "net worth" theory to support the forfeiture count in the indictment; (4) whether the district court properly interpreted the "five or more" element of 21 U.S.C. Sec. 848; and (5) whether Milburn's prison sentence was cruel and unusual.
 
 
 3
 A. Milburn's Sixth Amendment/Forfeiture Claim.
 
 
 4
 About seven months before Milburn's trial, the government sought an ex parte restraining order under 21 U.S.C. Sec. 848 to prevent Milburn, his parents, and the Throops from selling or moving interests in twenty-one pieces of property which it alleged were purchased with profits of crime. The district court granted a ninety-day TRO which, after separate hearings, was extended until an adversary hearing could be held. At the adversary hearing, the magistrate found that the government had carried its burden as to all but three of the enumerated items of property. As a result, the district court extended the TRO until the trial's end. For reversal, Milburn argues that the district court's failure to follow proper procedure in restraining his assets deprived him improperly of his sixth amendment right to retain counsel of his choice.
 
 
 5
 We turn first to the question of whether the district court complied with proper procedure for restraining Milburn's use of his property. The relative rarity of forfeiture provisions in criminal statutes throughout American history suggests that criminal forfeitures are extreme sanctions. This compels us to scrutinize closely the constitutional implications of ex parte criminal forfeitures or restraints. This point is underscored by the in personam nature of this type of forfeiture; the guilt of the defendant is at issue, and the loss of his property operates as an additional criminal penalty. See United States v. Long, 654 F.2d 911, 914 (3d Cir.1981). Under the circumstances, the process that is due becomes that much greater.
 
 
 6
 In pertinent part, 21 U.S.C. Sec. 848(d) (1982) provides:
 
 
 7
 The district courts of the United States * * * shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as they shall deem proper.
 
 
 8
 The highly discretionary nature of the statute has led the courts to limit their own discretion under the statute, discretion which otherwise might be susceptible to abuse. After the temporary restraining order had been issued in this case, but before the adversary hearing was held, the district court properly invoked Fed.R.Civ.P. 65, which sets forth the standards for ex parte restraining orders. See United States v. Spilotro, 680 F.2d 612, 617 (9th Cir.1982). At the adversary hearing, the district court also approved use of the federal rules of evidence, including the proscription of hearsay evidence.
 
 
 9
 The standard for an in personam forfeiture proceeding under the CCE or RICO statutes has been set out by three other courts of appeals. The Third Circuit standard is the most often-cited enumeration of the criteria governing restraining orders, and is a standard with which we agree.
 
 
 10
 Before a court can issue [preconviction restraining orders that prohibit transfer of a defendant's property], however, the government must demonstrate that it is likely to convince a jury, beyond a reasonable doubt, of two things: one, that the defendant is guilty of violating the Continuing Criminal Enterprise statute and two, that the profits or properties at issue are subject to forfeiture under the provisions of section 848(a)(2). * * * In addition, these determinations must be made on the basis of a full hearing; the government cannot rely on indictments alone. [Citations omitted.]
 
 
 11
 Long, 654 F.2d at 915. See also United States v. Crozier, 674 F.2d 1293, 1297-98 (9th Cir.1982); United States v. Veon, 538 F.Supp. 237, 245 (E.D.Cal.1982).
 
 
 12
 Given these standards, we do not believe that the district court adhered to the principles of due process. In the government's Motion for Restraining Order, the United States Attorney declared that "the Court's power to so act [in entering restraining orders under Sec. 848(d) ] is plenary and may be entered sua sponte, or ex parte without the necessity of a hearing." This is an incorrect statement of the law. As the district court subsequently noted, and as we have noted above, Federal Rule of Civil Procedure 65 is incorporated by inference in the "restraining orders or prohibitions, or * * * other actions" which the district court may authorize under section 848(d). Any other policy would allow the essential decision on the restraining order affecting defendants' assets and ability to pay retained counsel to be made ex parte without retained counsel and on the basis of affidavits or indictments. Although the preliminary injunction hearing and the trial which follow might offer some protection of defendants' rights, they are too little and too late to guarantee the protections of retained counsel.
 
 
 13
 Other courts have taken this position in cases less egregious than this one, cases in which the sixth amendment is not implicated. In Crozier, the Ninth Circuit used an imperative in interpreting the procedural requirements of section 848(d):
 
 
 14
 In the absence of specific language to the contrary, the district court must apply the standards of Rule 65 of the Federal Rules of Civil Procedure, which requires an immediate hearing whenever a temporary restraining order has been granted ex parte.
 
 
 15
 674 F.2d at 1297. See also Spilotro, 680 F.2d at 617 (citing the quoted passage with approval).
 
 
 16
 The district court's belated recognition in this case that section 848(d) implicitly relies on Rule 65 is insufficient to cure the effects of its earlier noncompliance with the procedural safeguards of the rule. Rule 65(b) provides a checklist of the procedural requirements which the district court disregarded. First, it must "clearly appear[ ] from specific facts" that "immediate and irreparable injury, loss, or damage will result to the applicant" before an adversary hearing can be convened. [Emphasis added.] The district court's order of August 23, 1982 (which omits reference to Rule 65) makes no reference to the strength or specificity of the underlying facts and suggests only that defendants "might place certain property beyond the jurisdiction of this Court * * *." (Emphasis added.)[2] Second, before a temporary restraining order is granted under Rule 65, the applicant's attorney must certify to the court, in writing, the efforts made to notify the opposing party and the reasons supporting his claim that notice is unnecessary. Neither the district court's order nor the government's affidavit refers to the ex parte nature of the temporary restraining order nor do they comply with this notice requirement. In addition, the district court's order does not "define the injury and state why it is irreparable and why the order was granted without notice." The order also exceeds the ten-day expiration date by eighty days without good cause shown, and the record does not reflect that the second hearing was "set down for hearing at the earliest possible time and [took] precedence of all matters except other matters of the same character."
 
 
 17
 Our disapproval of the district court's failure to comply with these requirements is not an elevation of form over substance. We reiterate that the forfeiture portion of the CCE statute places great importance on the temporary restraining order, at least as regards non-indigents' right to retained counsel. If the temporary restraining order freezes the defendant's assets, additional hearings are unavailing because the defendant's ability to pay counsel has already been foreclosed. As a result, compliance with the procedural safeguards of Rule 65 at the outset is essential if we are to guarantee the full measure of defendants' sixth amendment rights.
 
 
 18
 We next consider the effect of the restraining order on Milburn's assets. Although the briefs do not specifically enumerate the nature or value of Milburn's assets after the order, Milburn's brief claims that he was reduced to the status of a "pauper." Logically, this conclusion is supported by extent of the list of property affected and by the government's use of the net worth method to trace the path of Milburn's alleged drug profits. The list of property seized appears to be a thorough catalogue of Milburn's holdings: eight parcels of land, two cars, a truck, a boat, and assorted furniture. In addition, the government presented evidence in support of its net worth theory which established that, for the time of the investigation, Milburn's legitimate income was minimal, but that he had spent over $200,000 under assumed names or through others on specific property over three years. Given his limited financial means and the breadth of assets restrained by the district court, we can only conclude that Milburn was stripped of most of his assets and would have been severely hampered in his ability to pay his chosen counsel.
 
 
 19
 The third question we must answer is the extent to which the sixth amendment protects non-indigents' choice of retained counsel, and, if so, whether Milburn's conviction must be reversed. The Constitution recognizes solvent defendants' interest in retained counsel. In Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court discussed the dilemma of the Scottsboro rape defendants, for whom the entire county bar was appointed counsel. Before voiding this subterfuge, the Supreme Court observed that "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." Id. at 53, 53 S.Ct. at 58. The Eighth Circuit has also recognized this right: "In general, defendants are free to employ counsel of their own choice and the courts are afforded little leeway in interfering with that choice." United States v. Cox, 580 F.2d 317, 321 (8th Cir.1978), cert. denied, 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979), cited with approval in United States v. Agosto, 675 F.2d 965, 969 (8th Cir.1982).
 
 
 20
 The D.C. Circuit has stressed even greater recognition of this right. Although that Court denied a motion for continuance to secure counsel after the original counsel withdrew, it phrased in strong language the sixth amendment's protection of non-indigents' choice of counsel:
 
 
 21
 An essential element of the Sixth Amendment's protection of the right to the assistance of counsel is that a defendant must be afforded a reasonable opportunity to secure counsel of his own choosing. * * * An accused who is financially able to retain counsel must not be deprived of the opportunity to do so.
 
 
 22
 United States v. Burton, 584 F.2d 485, 488-89 (D.C.Cir.1978), cert. denied, 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979).[3]
 
 
 23
 This right is generally regarded as a qualified right which "must be carefully balanced against the public's interest in the orderly administration of justice." Burton, 584 F.2d at 489. What is not so widely discussed, however, is whether a solvent defendant who is denied chosen counsel and who is not impeding the administration of justice, must show prejudice from this denial in order to obtain relief. Only the Ninth Circuit has addressed this issue directly. In United States v. Ray, 731 F.2d 1361, 1365 (9th Cir.1984), that Court considered a claim on facts similar to the case at bar and concluded that "[d]enial of this qualified right is reversible error regardless of whether prejudice is shown." The Ray Court relied on Releford v. United States, 288 F.2d 298, 301 (9th Cir.1961), which reversed and granted a new trial where the defendant was deprived of his choice of retained counsel.
 
 
 24
 We find merit in the Ninth Circuit's view; Milburn, however, is in no position to raise this issue on appeal. Even though he had some contact with Minnesota counsel in this matter, he did not request that the district court appoint that counsel, nor did he request the services of any other named attorney. We also note that Milburn's appointed counsel represented him ably with a thorough and aggressive defense. This is not a case in which counsel was minimally competent; rather, we find that Milburn's counsel fully discharged his duties in protecting Milburn's rights. Thus, we conclude that, under the circumstances, Milburn's right to chosen counsel was not violated.[4]
 
 
 25
 B. Use of the Net Worth Theory as a Means of Forfeiture.
 
 
 26
 1. The Propriety of the Net Worth Method.
 
 
 27
 In pertinent part, the CCE statute provides that
 
 
 28
 (2) Any person who is convicted under paragraph (1) of engaging in a continuing criminal enterprise shall forfeit to the United States--
 
 
 29
 (A) the profits obtained by him in such enterprise, and
 
 
 30
 (B) any of his interest in, claim against, or property or contractual rights of any kind affording a source of influence over, such enterprise.
 
 
 31
 21 U.S.C. Sec. 848(a)(2) (1982).
 
 
 32
 Milburn argues that the district court's application of this statute in his case was improper for two reasons: first, the government improperly relied on a net worth theory in determining what property would be forfeited under the act; and second, in developing its net worth theory, the government was allowed to introduce testimony and records which were irrelevant, confusing and prejudicial. We disagree on both points.
 
 
 33
 First, we address the propriety of the net worth theory. The government has long relied on this theory in tax evasion cases to demonstrate that a taxpayer's expenditures in a given period exceed his legitimate or reported income. See, e.g., Capone v. United States, 51 F.2d 609 (7th Cir.1931). In the context of income tax evasion, the Supreme Court has explicitly approved its use, with certain safeguards. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943). In Holland, however, the Court warned that the method was "so fraught with danger for the innocent that the courts must closely scrutinize its use." Holland, 348 U.S. at 125, 75 S.Ct. at 130. Nevertheless, we feel that that standard was met here.
 
 
 34
 The facts and evidence in this case are crucial to distinguishing it from the Holland case. Perhaps the most important factual element distinguishing this case from Holland is that Milburn himself, in consensually recorded conversations with a government witness, refuted the possibility of a preexisting legitimate source for his remarkably high net worth. In a series of remarks to Ron Humphries, Milburn warned that "If they can prove its dope money we're all gonna go down for conspiring to continue a criminal enterprise." More specifically, he confessed his parents' involvement in the conspiracy to evade taxes:
 
 
 35
 and the fact is * * * I did put a lot of money into my mom and dad's house * * * you know that, and Mike Richmond does too.
 
 
 36
 Subsequently, when he confided to Humphries his hypothetical defense to the forfeiture charge, he undercuts his argument on the net worth point and resolves the argument for the government:
 
 
 37
 Why couldn't my father have had $50,000.00 in a shoe box all his life, they can't prove it, can they?
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 * * * my dad's got this covered * * *,
 
 
 41
 * * * I'm covered. I've been covering my ass ever since this, all this shit started.
 
 
 42
 We also note that the government proved the existence of a lucrative drug distribution enterprise over several years in several states and involving several principals. In addition, government evidence suggested that, for the time in question, this enterprise produced profits of approximately $200,000. (Milburn suggests the figure is closer to $85,000; either way, we regard the illegal income as significant.) Moreover, the government's financial evidence was thorough; for the period in question, the evidence appears to foreclose all leads which might have suggested other, legitimate sources of income. See Holland, 348 U.S. at 127, 75 S.Ct. at 131. Tax returns, expenditures and business records of the principals and even of Debbie Martin's store, Mother Earth, confirm the thoroughness of the government's inquiry.
 
 
 43
 In light of these circumstances, we believe that the district court properly used the net worth theory, and we find it unnecessary to impose upon the government the formality of a burden of an opening net worth statement. In addition to the factual distinctions between Holland and the case at bar, we note that this case departs from the classic income tax case involving net worth issues. This case involves net worth and specific items of property, and where the government shows an accumulation of income far beyond the defendant's legitimate means, an opening net worth figure is not essential. We note, however, that this departure from Holland 's dicta applies only to the unique facts of this case. Under other circumstances, an opening net worth might be necessary to assure that defendants are protected from the danger of circumstantial evidence.
 
 
 44
 2. Evidentiary Support for the Net Worth Theory.
 
 
 45
 Next we deal with Milburn's objections to the evidence that was actually presented in support of the government's net worth theory. He waived any objection to evidence regarding expenditures he made on his own home ("the Henderson House"), but challenged on grounds of relevance and materiality a substantial number of other exhibits, including documents involving loans made to his parents and the Throops to start their construction companies; the federal income tax returns of his parents, the Throops, Debra Elayer, and Debbie Martin; and documents relating to the construction and improvement of his parents' and the Throops' homes. Milburn maintains also that some of this evidence is hearsay which was not made in furtherance of the conspiracy, and that admission of certain testimony violated the confrontation clause of the sixth amendment. The number of exhibits in question is far too great to discuss each individually; we have reviewed the record thoroughly, however, and we believe that discussion of several of the major types of evidence to which Milburn objects should resolve the general problems presented in this aspect of Milburn's appeal.
 
 
 46
 We note that much of the evidence in question is disputed under Fed.R.Evid. 401-03. This Court has recognized the broad discretion vested in the trial court in determining the relevance of evidence. The trial court's decision is subject to reversal only for an abuse of discretion. United States v. Swarek, 656 F.2d 331, 337 (8th Cir.), cert. denied, 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981).
 
 
 47
 Much of Milburn's argument goes to the relevance of records of loans taken out in 1979 by his parents and in 1978 by the Throops, the proceeds of which were deposited respectively in the Creative Builders and P & R accounts and used, in part, to build the couples' homes. These accounts were used to conceal Milburn's drug profits as the real and personal property of his family.
 
 
 48
 We find no abuse of discretion in the admission of this evidence. Any potential hearsay problems are resolved by Milburn's attorney's stipulation at trial regarding the authenticity and the "business record" aspect of this evidence. Fed.R.Evid. 803(6). In addition, the government properly points out that the loan arrangements and the financing of the Milburns' and Throops' homes are "fact[s] * * * of consequence" under Fed.R.Evid. 401 because homes were subject to forfeiture under the CCE count[5] and the transactions involving these properties were among the overt acts specified in the tax evasion count of the indictment.
 
 
 49
 We also note that the loan evidence was an important and admissible part of the government's case in that the timing of the loan was useful in distinguishing illegal from legal income that had been invested in the homes. In the case of the Throops, stipulated testimony was read into the record regarding over $30,000 in currency which was deposited in the P & R Construction account before the loan proceeds were deposited. These currency deposits correlate with entries on a ledger kept by Debbie Martin, which apparently reflect monies obtained from drug sales.[6] Only by determining how much of the account was loan proceeds on a given date could the government show which portion of the account derived from drug sales. Similarly, evidence of the elder Milburns' loan and deposit into the Creative Builders account was relevant to distinguish legitimate from illegal deposits in that account. Accordingly, we find that the loan evidence was relevant and that it was properly admitted.
 
 
 50
 Milburn also challenges the exhibits relating to loans received by both couples on the ground that the makers were not present in court and were unavailable for cross-examination. We address this issue separately from our determination of the hearsay question because we recognize that the sixth amendment's confrontation clause is not perfectly congruent to the hearsay rule. Dutton v. Evans, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970). We have previously evaluated problems under the confrontation clause according to the potential prejudice a defendant faces due to the declarant's unavailability. Thus, we consider
 
 
 51
 whether the out-of-court statement bears traditional indicia of reliability, whether it was crucial to the government's case, whether the jury had an opportunity to weigh the credibility of the extrajudicial statement, and whether appropriate instructions were given by the trial judge.
 
 
 52
 United States v. Goins, 593 F.2d 88, 92 (8th Cir.1979), citing United States v. Scholle, 553 F.2d 1109, 1119 (8th Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).
 
 
 53
 Under the circumstances, we find that the loan documents do not run afoul of the sixth amendment. Their authenticity was stipulated, they were simply a circumstantial part of the government's net worth theory, and they appear to have been properly presented to the jury. Thus, we find no constitutional defect in this evidence in light of the unavailability of Milburn's relatives.
 
 
 54
 We also approve the district court's admission of evidence dealing with work done for or paid for by the Throops and the elder Milburns, for much the same reasoning we use in approving the evidence regarding the loans and the tax returns. This evidence is relevant as part of the government's net worth theory; it functions in much the same way the tax returns and the loans do in the government's case, for this evidence helps to confirm that the two couples were far outspending their reported income. We disagree with Milburn's claim that the government did not tie these expenditures to his drug profits. The correlations between entries in the drug ledger, currency deposits and expenditures on the homes amply support this link. Moreover, so does Milburn's statement to Debbie Martin, "Paula and Ron [Throop] will need money * * * so give them what they ask for;" and his statement to Humphries, "I did put a lot of money into my mom and dad's house." Further evidence of this link can be found in the fact that, after Debbie Martin's death, Milburn transferred to his parents' home the unused portion of a cash downpayment to a carpet supplier for work at Debbie Martin's store. After careful review, therefore, we find that the evidence of improvements done for the elder Milburns and the Throops was also properly admitted at trial.
 
 
 55
 Milburn also challenges the admission of the tax returns of the elder Milburns, the Throops, Debbie Martin and Susan Elayer. We have no trouble determining that these documents are relevant to the tax evasion conspiracy. Indeed, by admitting these documents, the district court did much to solve the problems raised by Milburn's argument regarding opening net worth, for the tax returns account for whatever sources of legitimate income the conspirators might have enjoyed during the life of the conspiracy. The Supreme Court has implicitly endorsed this practice. Calderon v. United States, 348 U.S. 160, 166, 75 S.Ct. 186, 189, 99 L.Ed. 202 (1954); Smith v. United States, 348 U.S. 147, 157-58, 75 S.Ct. 194, 199-200, 99 L.Ed. 192 (1954); Holland, 348 U.S. at 133, 75 S.Ct. at 134. Moreover, this Court has approved the admission of the tax returns of one conspirator against another where his "personal finances [are] * * * intertwined" with the object of the conspiracy. United States v. White, 671 F.2d 1126, 1132 (8th Cir.1982). See also United States v. Barnes, 604 F.2d 121, 146-47 (2d Cir.1979) (In a CCE case, income tax returns are relevant to show legitimate sources of income in light of large unexplained assets.) and cases cited therein. Therefore, the tax returns are relevant.
 
 
 56
 We also find that the tax returns were properly admitted under the coconspirator exception to the definition of hearsay. Fed.R.Evid. 801(d)(2)(E). Although the tax returns were not specified as overt acts of the tax evasion conspiracy, the superseding indictment specifies that the conspiracy occurred from 1974 until the date of the indictment, which includes the years of the tax returns in question. We believe the evidence introduced at trial was sufficient to demonstrate the existence of a conspiracy. United States v. Kiefer, 694 F.2d 1109, 1112 (8th Cir.1982). In addition, as we note above, this Court has explicitly approved the admission of coconspirators' tax returns. White, 671 F.2d at 1132. Accordingly, we find no error in the admission of the specified tax returns.
 
 
 57
 We have not discussed each piece of evidence mentioned by appellant Milburn in his lengthy appendix, nor need we do so. We have carefully reviewed the trial record, however, and we believe that the reasoning we have set forth in this section of the opinion extends to all of the evidence in question. Under the circumstances of the net worth theory developed by the government in this case, we cannot say that this evidence was erroneously admitted.
 
 
 58
 C. The CCE Statute: The "five or more" element.
 
 
 59
 1. Proof of the "five or more" requirement.
 
 
 60
 Under 21 U.S.C. Sec. 848(b), a defendant must satisfy five elements to be guilty of engaging in a CCE. They include:
 
 
 61
 1) a felony violation of the federal narcotics laws;
 
 
 62
 2) as part of a continuing series of violations;
 
 
 63
 3) in concert with five or more persons;
 
 
 64
 4) for whom the defendant is an organizer or superviser;
 
 
 65
 5) from which he derives substantial income or resources.
 
 
 66
 United States v. Lurz, 666 F.2d 69, 75 (4th Cir.1981), cert. denied, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982).
 
 
 67
 For reversal, Milburn argues that the government has not proven either that he organized or supervised the group or that the group comprised five or more persons. Rather, he maintains that he was an equal partner with two or three others in the drug business.
 
 
 68
 Other Courts of Appeals have construed the "five or more" language and the supervisory clause broadly. Several courts have pointed out that the supervisory clause ("a position of organizer, a supervisory position, or any other position of management") includes disjunctive language which obliges the government to prove that the defendant occupied only one of those positions. United States v. Phillips, 664 F.2d 971, 1034 (5th Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); United States v. Mannino, 635 F.2d 110, 116 (2d Cir.1980); United States v. Jeffers, 532 F.2d 1101, 1115-16 n. 17 (7th Cir.1976), aff'd, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). In addition, the courts have generally held that the five subordinates in the enterprise need not act together; it is sufficient to sustain the prosecution if the superior works with a total of five participants. Phillips, 664 F.2d at 1034; Mannino, 635 F.2d at 116; United States v. Barnes, 604 F.2d 121, 157 (2d Cir.1979), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); United States v. Bolts, 558 F.2d 316, 320 (5th Cir.), cert. denied, 474 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977).
 
 
 69
 Careful review of the trial transcript suggests that Milburn occupied a sufficiently central role to be regarded as holding "a position of organizer, a supervisory position or any other position of management." In addition, it seems clear that at least five others participated in the enterprise in such a way that they could be said to have fallen under Milburn's managerial authority.
 
 
 70
 Regarding the requirement of five co-participants, the record seems clear. As the government points out, Milburn apparently concedes that he supervised the activities of three of the participants: Ronald Humphries, Michael Richmond, and Mark McClellan. The record suggests that Alan Milburn was involved in marijuana sales as early as 1974. Ronald Humphries (who pled guilty to separate charges and testified at Milburn's trial as part of his plea) assisted Milburn by making monthly trips to Texas to return with approximately 300-400 pounds of marijuana per trip which the two packaged for sale in southeastern Missouri. By 1977, Milburn began selling Colombian marijuana, and Humphries made his trips to Fort Lauderdale, Florida, to purchase the marijuana from Gary Darnall.
 
 
 71
 In 1979, Milburn and Darnall moved out of marijuana and into cocaine sales; according to Humphries, they put up the money and he served as courier of drugs and money. Humphries made several trips to Florida that summer, but ended his business relationship with Milburn later that year. He was replaced as courier by Michael Richmond who had been one of Milburn's marijuana dealer-customers for several years. Richmond made several trips to Fort Lauderdale, Florida, to purchase cocaine from Gary Darnall, and to Dallas, Texas, to deliver cocaine to Ralph Ed Purdy. When Richmond was arrested for selling cocaine to a DEA agent in 1980, Mark McClellan replaced him as Milburn's courier, making several cocaine delivery trips to Dallas and Fort Lauderdale with a locked briefcase. In addition, McClellan delivered cocaine to Michael Adkins and Terry Crafton in Little Rock, Arkansas, and Kennett, Missouri. McClellan's period of employment with Milburn ended in January, 1981, when the two had a falling out over, among other things, Milburn's attempt to title a car in McClellan's name. Thus, the three appear inextricably entwined in the enterprise as Milburn's subordinates.
 
 
 72
 Several other participants round out the required number. Alicia Dalton Buchanan, Humphries' then-girlfriend, was not indicted, but participated in the cocaine purchases. According to her trial testimony, she assisted Humphries in February, 1979, on a trip to Florida to purchase cocaine and, by herself, made two trips to Florida to buy cocaine on orders of Humphries and Milburn in the summer of 1979. She was also present at frequent business discussions in the summer of 1978 through early 1979.
 
 
 73
 Susan Elayer,[7] another of Milburn's girlfriends, also played a role in the enterprise. In a consensually recorded conversation with Humphries, who was cooperating with the government, Milburn himself indicated that Elayer was to be Humphries' contact in Milburn's absence. In addition, McClellan used Elayer's car on at least two cocaine trips for Milburn. McClellan also testified that Elayer called on him to pick up the money from cocaine sales along with the briefcase that was typically used to transport the cocaine.
 
 
 74
 Ralph Ed Purdy, Milburn's contact in Dallas, could also be said to be subject to Milburn's supervisory or managerial control. McClellan testified that, when he was in Dallas, Purdy relayed Milburn's orders to McClellan to stop for a drug sale in Little Rock and, on another occasion, to contact Milburn for further orders. Although this degree of contact and involvement with the enterprise was not intimate, it suggests that Purdy worked at Milburn's bidding during the life of the enterprise and served as a conduit for his orders. Thus, Purdy's conduct clearly falls within the ambit of the statute.
 
 
 75
 The elder Milburns and the Throops also qualify as subordinates in the enterprise who satisfy the statute's five-person requirement. Regarding drug sales, McClellan testified that he and Milburn stopped at the Throops' home for expense money and for cocaine packaging materials. The two couples' involvement in the concealment of Milburn's drug profits also cements their connection to Milburn as his subordinates. The government's financial evidence under its networth theory amply demonstrates their complicity in the scheme. Moreover, Milburn's letters describing his involvement in "real estate," and testimony describing Milburn's preference for highway frontage lots (which preference he communicated to his father and sister) confirms that the efforts the four expended on behalf of the enterprise were for Milburn's benefit.
 
 
 76
 Finally, Debbie Martin, Milburn's then-girlfriend, appears to have been involved with the enterprise in such a way as to satisfy the statute. Although Martin's involvement antedates the period of time set out in the superseding indictment (1977-82), she was also involved from 1977 until her death in September, 1979. In October, 1977, Milburn was jailed in Arkansas for possession of marijuana with intent to distribute. (The jury did not know of this conviction.) He served one-and-one-half years of a ten-year sentence; and, in his absence, Martin managed the marijuana business and instructed Humphries regarding his trips to Florida. Alicia Dalton Buchanan (who was then living with Humphries) testified that, while Milburn was serving his sentence, Debbie Martin frequently visited their home and often brought a ledger to plan Humphries' drug trips. In addition, Milburn's and Martin's correspondence during Milburn's period of incarceration suggests that he was directing her actions as she managed the drug business. Milburn's frequent references to the conduct of the principals (particularly Humphries) and his use of private code words ("star pines" and "balforia" for Mexican and Colombian marijuana) confirm that Debbie Martin was a subordinate in the enterprise directed by Milburn.
 
 
 77
 Thus, in reviewing the record and the evidence, we can only conclude that under the prevailing interpretation of section 848, Milburn occupied a position of authority in the enterprise and directed the efforts of at least five others.
 
 
 78
 2. The jury instructions.
 
 
 79
 Milburn also complains that the trial court's jury instructions misled the jury; Instructions 17 and 18 laid out the "five or more" element and the "organizer or supervisor" elements of the statute respectively. Milburn contends that the separation of the instructions suggests that the elements are separate, so the jury might have reasoned that, although it found that Milburn acted with five others, it need not have found that he supervised the group.
 
 
 80
 We disagree. Any potential confusion was resolved by the final sentence of Instruction 18, the supervisory instruction: "It is not necessary that the defendant's relationship to the five persons be of the same type at all times and it may differ with respect to certain persons with whom he acted in concert." By including this reference to the "five or more" element in the supervisory instruction, the district court made clear that, for Milburn to be guilty, he must have supervised the group.
 
 
 81
 D. Milburn's Sentence: The Constitutionality of Life Without Parole Under 21 U.S.C. Sec. 848.
 
 
 82
 Milburn also argues that his sentence under 21 U.S.C. Sec. 848--life imprisonment without possibility of parole--is cruel and unusual punishment proscribed by the eighth amendment. Although we acknowledge that the district court's use of the maximum sentence in this case was severe, we cannot say that, under the prevailing case law, the sentence violates the Constitution.
 
 
 83
 In pertinent part, 21 U.S.C. Sec. 848 provides that
 
 
 84
 (a)(1) Any person who engaged in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2); except that if any person engaged in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine of not more than $200,000, and to the forfeiture prescribed in paragraph (2).
 
 
 85
 * * *
 
 
 86
 * * *(c) In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and section 4202 of Title 18 and the Act of July 15, 1932 (D.C.Code, secs. 24-203 to 24-207), shall not apply.
 
 
 87
 21 U.S.C. Sec. 848(a), (c) (1982).
 
 
 88
 In its most recent discussion of the eighth amendment, the Supreme Court affirmed this Court's reversal of a conviction for uttering a $100 worthless check. Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Because that offense was the defendant's seventh nonviolent felony, he was sentenced under South Dakota's recidivist statute, which provides for a maximum penalty of life imprisonment without parole. In voiding that penalty for disproportionate severity, the Supreme Court articulated three objective factors to guide appellate review of sentences under the eighth amendment. First, the reviewing court should "look to the gravity of the offense and the harshness of the penalty." Second, it should "compare the sentences imposed on other criminals in the same jurisdiction." Finally, it should "compare the sentences imposed for commission of the same crime in other jurisdictions." Id., 103 S.Ct. at 3010.
 
 
 89
 In comparing the gravity of the offense with the harshness of the penalty, we must observe that the penalty is very harsh indeed. Nevertheless, Milburn's offense was also great. As the government points out, the organizing and running of Milburn's continuing criminal enterprise over four years involved scores, if not hundreds, of felonies as he distributed marijuana and cocaine and as he used the telephone to facilitate the commission of these offenses. In addition, the record confirms that Milburn had three previous felony convictions for drug possession and sale.
 
 
 90
 Comparison of Milburn's sentence with sentences of the few other criminals in the Eastern District of Missouri who have been sentenced under the statute also confirms that his sentence is severe. The other CCE cases in this district also imposed long prison terms, but not life sentences. In United States v. Becton, 751 F.2d 250 (8th Cir.1985), a CCE defendant was sentenced to twenty-five years in prison and a $25,000 fine. The defendant in United States v. Kirk, 534 F.2d 1262 (8th Cir.1976), cert. denied, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977), a major St. Louis drug dealer, was sentenced to forty years in prison on a CCE charge.[8] Although those sentences are not of the same duration as Milburn's, we cannot say they are of an entirely different order. All of these terms are harsh and none allow early release on parole. Accordingly, we cannot say that Milburn's term diverges so radically from this small sample of cases that it violates the Constitution.
 
 
 91
 In comparing his sentence with the sentences of his coconspirators and with the sentences of other drug dealers in the Eastern District of Missouri, Milburn makes an inapposite analogy. Comparison between sentences under different statutes may be valuable in other cases, but not in the CCE context. The legislative history of the CCE statute suggests that it was designed to distinguish between large-scale drug trafficking and small-time users. See, e.g., 116 Cong.Rec. 1183 (January 26, 1970) (remarks of Senator Dole) (distinguishing the "professional criminal" from the "youthful offender"). In addition, the elements of the statute recognize that a defendant in a CCE case has committed a considerably more severe offense than an ordinary drug dealer; in addition to selling drugs, he must occupy a supervisory position and derive substantial income from his enterprise. 21 U.S.C. Sec. 848(c) (1982). None of Milburn's codefendants and none of the defendants in the other cases on which he relies for comparison meet these elements and, thus, constitute imperfect analogies.
 
 
 92
 The third element in the Solem test is the comparison between Milburn's sentence and sentences imposed on criminals in other jurisdictions. This comparison gives us a much larger sample of sentences. As a result, the existence of life sentences in other jurisdictions puts Milburn's sentence in perspective and suggests that, on the basis of nationwide norms, his sentence is not unusual.
 
 
 93
 In Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), the Supreme Court considered the sentence a Gary, Indiana, crime boss received under the CCE statute for his involvement in drug sales, extortion, and robberies. The Court let stand his sentence of life without parole and a $100,000 fine. More recently, the Second Circuit rejected the section 2255 petition of a CCE defendant who pled guilty to a twenty-five-count narcotics indictment with sixteen coconspirators. That Court also let stand a sentence of life without parole. Williams v. United States, 731 F.2d 138, 140 (2d Cir.1984). In several other cases, Courts of Appeals have upheld the maximum sentence under the CCE statute. Sperling v. United States, 692 F.2d 223, 224-25 (2d Cir.1982), cert. denied, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983) (life sentence and $100,000 fine for heroin and cocaine enterprise); United States v. Barnes, 604 F.2d 121, 155-58 (2d Cir.), cert. denied, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980) (life sentence and $100,000 fine for heroin conspiracy); United States v. Bolts, 558 F.2d 316, 319 (5th Cir.1977), cert. denied, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978) (fifteen-person enterprise smuggled cocaine from Asia and Colombia; leader sentenced to life imprisonment); United States v. Sisca, 503 F.2d 1337, 1339 (2d Cir.), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (life sentence under CCE statute for heroin and cocaine distribution network not challenged on appeal), and one Court of Appeals explicitly upheld a life sentence under eighth amendment attack. United States v. Valenzuela, 646 F.2d 352, 354 (9th Cir.1980) (defendant sentenced for his role in international heroin conspiracy with distribution centers in Los Angeles and New York; court holds "The punishment provision of section 848, as applied to the facts of this case, does not violate the eighth amendment.")
 
 
 94
 In reviewing Milburn's sentence in light of the criteria announced in Solem, therefore, we conclude that his sentence did not violate the eighth amendment. In reaching this conclusion, we heed the instruction in Solem that reviewing courts should "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." Solem, 103 S.Ct. at 3009. We note that the legislative history of the statute reflects congressional intent to create "a strong deterrent to those who otherwise might wish to engage in the illicit traffic, while also providing a means for keeping those found guilty of violations out of circulation." H.R.Rep. No. 91-1444 (Part 1), 91st Cong., 2d Sess. 10, reprinted in 1970 U.S.Code Cong. & Ad.News 4566, 4576. Thus, given the plain meaning of the statute and the prior approval of other courts, we face no other alternative but to uphold Milburn's sentence. Although we feel obliged to uphold this sentence, we note that it is very severe. We suggest that the district court may wish to reconsider the severity of this sentence under Fed.R.Crim.P. 35.
 
 
 95
 II. THE ELDER MILBURNS AND THE THROOPS.
 
 
 96
 A. Evidentiary Issues.
 
 
 97
 1. Admission of Evidence of Cocaine Trafficking.
 
 
 98
 Although all of the defendants in this consolidated appeal were initially tried jointly, three days into the trial the district court declared a mistrial as to Milburn, his parents, and the Throops. Subsequently, the couples were tried jointly, and Milburn was tried individually. As part of the evidence of the conspiracy to conceal Milburn's drug-related income, the government introduced a considerable quantity of testimony and documents relating to the cocaine trafficking scheme which produced the income that these appellants allegedly helped to conceal. The district court declined to admit evidence of cocaine possession and distribution which did not involve Milburn, but admitted evidence of Milburn's role in the drug enterprise on the condition that the government properly tie that evidence to the tax fraud conspiracy. We acknowledge that the potential for prejudice in admitting such evidence is great and we believe that the district court properly excluded evidence of cocaine sales that did not involve Milburn. However, the trial transcript reflects that, when Milburn's activities were the subject of trial testimony, the district court was careful to caution the jury not to convict the elder Milburns and the Throops for tax evasion based solely on evidence of Alan Milburn's drug dealing. These cautionary instructions helped to purge whatever prejudice might inhere in this evidence, and, for the reasons enumerated below, we find no error in the admission of this evidence.
 
 
 99
 As we acknowledged in our review of Milburn's argument, "relevance" is determined by the tendency of the evidence "to make the existence of any fact that is of consequence * * * more probable or less probable * * *." Fed.R.Evid. 401. We reiterate that the trial court is vested with considerable discretion regarding the admission of evidence, and that its decision is entitled to deference on appeal. United States v. Swarek, 656 F.2d 331, 337 (8th Cir.), cert. denied, 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981); United States v. Dennis, 625 F.2d 782, 797 (8th Cir.1980).
 
 
 100
 We find that the evidence was relevant under Fed.R.Evid. 401 because it demonstrates Milburn's involvement in drug trafficking of considerable volume and value which produced significant income that could be traced to these two couples. This court and others have admitted evidence of drug dealing on similar reasoning, even where it may not have been directly probative of the offense at issue. Thus, in United States v. Horvath, 731 F.2d 557, 563 (8th Cir.1984), in which the defendants were convicted of conspiring to evade income taxes, we approved the admission of evidence of a massive scheme to import and distribute marijuana. The Fifth Circuit allowed evidence of cocaine dealing to prove a conspiracy to launder money in the Grand Cayman Islands and to impede the IRS in the computation and collection of income taxes. United States v. Enstam, 622 F.2d 857, 860 (5th Cir.1980), cert. denied, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). Similarly, in United States v. Browning, 723 F.2d 1544, 1547 (11th Cir.1984), testimony about the defendant's ownership of "drug boats" was admitted to prove the defendant's intention to conspire to evade federal income taxes. Potentially prejudicial evidence of other crimes has also been approved in income tax evasion cases. E.g., Clinkscale v. United States, 729 F.2d 940, 942 (8th Cir.1984) (testimony that prostitutes were turning over income to defendant which he failed to report). We acknowledge that these cases do not involve the admission against defendants of facts involving a third party as is the case here. Nevertheless, we believe that these cases speak to the issue of potential prejudice posed by Milburn's cocaine dealings, and we find that no prejudice resulted.
 
 
 101
 Close analysis of the evidence in light of the appellants' argument, however, is essential to disposition of this argument. The appellants base much of their argument on the suggestion that Milburn began selling cocaine in 1979, after the couples had completed their purchases of the assets to which Milburn's money was traced. Thus, they argue that the cocaine evidence is irrelevant because they could not have been involved in concealing the resulting income. The evidence does not support this contention. According to Ron Humphries, Milburn switched from selling marijuana to cocaine in May, 1979, and these appellants participated in the tax fraud conspiracy from that date until the date of the indictment. For example, the evidence confirms that, until November, 1979, the elder Milburns paid for building materials and labor in the construction of their home with currency or checks that can be linked to Milburn. The record also suggests that Marion Milburn and Paula Throop paid for the remodeling of Milburn's house in late 1979-80, and that the Throops built a cabin in 1980 at Hidden Valley, partially with monies realized from the sale of an Airstream trailer (which was purchased in 1978 with marijuana money), coupled with currency expenditures traced to Milburn's drug profits.
 
 
 102
 We also note that the conspiracy did not depend entirely on the concealment and expenditure of funds; the concoction of stories and feints to throw the government off the track also was part of the conspiracy and continued after 1979. Thus, when Ross E. Milburn's tax adviser asked about his son's taxes, Ross E. Milburn replied that he was giving his son $100 per week, which he described as funds which permitted them to file income tax returns. In addition, Paula Throop deceived an IRS agent in May, 1981, by denying that Milburn had provided any funds for her house or her parents' house; instead, she told the agent that the Throops' money had come from cash savings ($20,000-$30,000 saved in their home) and currency loans ($25,000) from her sister and father. At the same time and later that summer, Ross E. Milburn conferred with his tax adviser and admitted that he held Alan's property in his name and the two discussed whether the elder Milburn's income appeared large enough to have acquired that much property. Thus, we conclude that the concealment continued long after 1979, and, in light of other evidence discussed herein, supports the admission of the cocaine evidence to demonstrate the source of the income which was concealed.
 
 
 103
 Finally, with regard to the cocaine evidence, we decline to accept the appellants' suggestion that we impose a strict tracing requirement on the currency which resulted from the government-arranged "controlled buys" which led to Milburn's arrest. As we have noted above, we find that this evidence was relevant to show the source of the concealed income. In addition, as we noted in our discussion of the CCE issue above, strict tracing requirements are not typically part of the government's burden in net worth cases. The Supreme Court has declared that
 
 
 104
 the government did not have to report the exact amounts of unreported income by [appellant]. To require more or more meticulous proof than this record discloses that there were unreported profits from an elaborately concealed illegal business, would be tantamount to holding that skilled concealment is an invincible barrier to proof.
 
 
 105
 United States v. Johnson, 319 U.S. 503, 517-18, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546 (1943).
 
 
 106
 As we noted in that section, the net worth method carries with it great potential for prejudice. Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954). Therefore, use of that method must be carefully examined in each instance, and our refusal to impose strict tracing requirements is limited to the circumstances of this case.
 
 
 107
 Among the circumstances that we believe preclude any possibility of prejudice from this evidence is the fact that the appellants conspired with Milburn and are bound by his acts and declarations. Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); Pinkerton v. United States, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 1183-84, 90 L.Ed. 1489 (1946).
 
 
 108
 The cocaine evidence assumes greater relevance in light of these cases when we consider the appellants' actions which continued to perpetuate the conspiracy after the cocaine sales. For example, Ross E. Milburn continued writing checks for Alan until March, 1981; Milburn billed telephone calls to the Throops' cabin on their credit card until April; in May, Paula Throop gave her false story concerning the source of their funds to purchase their home; and in June, Marion Milburn made Alan's house payment. This degree of continuing involvement by all of the conspirators supports the admission of the cocaine evidence.
 
 
 109
 We are also influenced by the links which, at least in part, suggest that the proceeds from one of the controlled cocaine buys can be traced to the appellants. On February 6, 1981, Alan Milburn sold an ounce of cocaine to government agents for $1,800; later that day, Ross E. and Alan Milburn made a $500 cash downpayment on a new truck for Alan in the name of "Ross Milburn." On the same day, Ross E. Milburn also signed the power-of-attorney form at the time of the transaction and subsequently paid for the truck with a $3,878 check. Therefore, we reject the appellants' tracing argument and approve the admission of the cocaine evidence.
 
 
 110
 2. Debbie Martin's Drug Ledger.
 
 
 111
 As we have noted elsewhere, the government relied heavily in both trials on Debbie Martin's records of drug finances. One page of Debbie Martin's ledger entitled "Paula" apparently listed approximately $100,000 disbursed to Paula and Ron Throop for purchasing and improving the Throop and Ross E. Milburn homes. The appellants objected at trial to this key evidence and argue on appeal that the "Paula" page was never authenticated and that it was inadmissible hearsay. We disagree.
 
 
 112
 To be admitted into evidence, documents must be authenticated or identified in such a way as "to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). Although Ron Humphries testified that he had seen the ledger at least weekly for a year and a half, he had not seen the "Paula" page until two years after Martin's death. Despite his and Marta Green's (an employee at Martin's store) inability to identify the "Paula" page, in light of controlling precedent, we find other circumstances identify the document.
 
 
 113
 This Court has held that the genuineness of a document may be established by circumstantial evidence. In United States v. Wilson, 532 F.2d 641, 645 (8th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), we approved the admission of notebooks relating to drug trafficking where the notebooks were characterized by a kind of "code of which only someone connected with the transactions would have known." Id. Similarly, in United States v. De Gudino, 722 F.2d 1351 (7th Cir.1983), the Seventh Circuit approved the admission of lists of information relating to the smuggling of illegal aliens. That Court noted that the contents of the notebook indicated the author's familiarity with defendants' procedures. Id. at 1355. Circumstantial evidence, such as the fact that the notebooks were found in an apartment used by defendants, also contributed to that Court's determination of authenticity. Id.
 
 
 114
 The circumstances of this case present us with a stronger set of authenticating facts than either of these cases. Ron Humphries and Mike Richmond identified the ledger and its other pages, which closely resemble the format of the "Paula" page. According to several witnesses, the handwriting of the entries (the name, column headings, numbers, and annotations) identified them as the entries of Martin and Milburn. Moreover, the coincidental correlation between the numbers entered on the "Paula" page and the couples' 1978 property expenditures is a good circumstantial indicator of authenticity. In addition, Marta Green testified that the entries did not relate to the business, which eliminates another possible explanation for the data. Finally, Debbie Martin's death in 1979 eliminates any possibility that the entries were made after the conspiracy. Therefore, we find that the evidence was properly authenticated.
 
 
 115
 We also reject any suggestion that this evidence was inadmissible hearsay. Although Debbie Martin was an unnamed conspirator, we believe this evidence is admissible as a statement by a coconspirator during the course and in furtherance of the conspiracy. Fed.R.Evid. 801(d)(2)(E). To fulfill the requirements of this rule, the government must demonstrate that 1) a conspiracy existed; 2) defendant and declarant were both members of the conspiracy; and 3) the declaration was made during the course of and in furtherance of the conspiracy. United States v. Leroux, 738 F.2d 943, 949 (8th Cir.1984); United States v. Bell, 573 F.2d 1040, 1043 (8th Cir.1978). In establishing the existence of a conspiracy, the government must only demonstrate "a likelihood of illicit association between the declarant and the defendant." United States v. Scholle, 553 F.2d 1109, 1117 (8th Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). Evidence adduced on this point in the case at bar also demonstrates the second requirement, Milburn's and Martin's membership in the conspiracy. The evidence amply demonstrates the illegal association between Milburn and Martin; especially probative was their correspondence while Milburn was incarcerated in Arkansas on the marijuana charge, and the testimony of Ron Humphries regarding the rest of the drug ledger. Significantly, the defendants can be convicted of conspiring with associates unknown to the grand jury if the indictment asserts their existence and the evidence supports their existence. United States v. Klein, 560 F.2d 1236, 1242 (5th Cir.1977), cert. denied, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978). Moreover, the defendants need not be charged with conspiracy to invoke the coconspirator exception to the hearsay rule. United States v. Kiefer, 694 F.2d 1109, 1112 n. 2 (8th Cir.1982). Logically then, Fed.R.Evid. 801(d)(2)(E) applies to both unindicted and unnamed coconspirators. United States v. Ziperstein, 601 F.2d 281, 294 (7th Cir.1979), cert. denied, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). The indictment in this case included "others known and unknown to the Grand Jury * * * " and the evidence supports Debbie Martin's involvement in the enterprise.
 
 
 116
 That the "Paula" page was made in the course of the conspiracy is demonstrated by much of the evidence used to authenticate the document. The figures it contains correlate with the property expenditures, see De Gudino, 722 F.2d at 1356 ("The fact that the lists contain dates and records of payment is evidence that they were written during the course of the conspiracy."), the entries are dated, five annotated entries tie the entries to property expenditures by these appellants, and Debbie Martin's death refutes any suggestion that the page could have been composed after September, 1979.
 
 
 117
 Finally, there can be little doubt that the "Paula" page was used in furtherance of the conspiracy. Accounting records are essential even for a criminal enterprise's continued vitality; without accurate bookkeeping, the purchase of drugs and concealment of taxable income could not have continued. See id. at 1356 ("The names, dollar figures, and telephone numbers are evidence that the lists were utilized to maintain information necessary to continue the smuggling activities of the conspiracy."); United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir.1982), cert. denied, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983) (conversations relating to collection of money are admissible).
 
 
 118
 Accordingly, we find this evidence was properly admitted.
 
 
 119
 3. Charles Goodale's Testimony.
 
 
 120
 The appellants also argue that the trial court erred in admitting into evidence Charles Goodale's account of a conversation he had with the Throops. Goodale and his wife were casual friends of the Throops, and the two men later worked together. When the Throops built the house at issue in this proceeding, they sold their first house to the Goodales. At trial, Goodale testified that, early in 1978, he and his wife visited the Throops for a social evening when Ross E. Milburn called Paula Throop and discussed a phone call he had had from Alan Milburn. According to Goodale, Paula related the gist of the conversation to her husband while the Goodales were present; Ross E. Milburn had told her that Alan Milburn had directed him to purchase highway frontage lots. Paula explained to the Goodales that the conversation related to a "family business" engaged in real estate speculation.
 
 
 121
 We reject the appellants' characterization of this testimony as "triple hearsay" because we find the district court properly admitted the testimony under Fed.R.Evid. 801(d)(2)(E). As we noted earlier, for such evidence to be admissible, the government must demonstrate that the statement was made during the course of and in furtherance of the conspiracy of which the defendant and declarant were members. Bell, 573 F.2d at 1043.
 
 
 122
 These remarks were undoubtedly made during the life of the conspiracy. The record reflects that the conspiracy was fully functioning well before the Throops' and Goodales' visit that evening. Ross E. Milburn had apparently taken steps in 1976 to conceal his son's property interest in his own home by changing the title from "Alan Milburn and Deborah L. Martin Milburn, his wife"[9] to "Ross Milburn and Debra L. Martin, as joint tenants." According to stipulation, Ross E. Milburn also signed the new deed and assumed the mortgage in his name. In 1977, the Milburns worked a similar arrangement regarding Alan Milburn's truck, which was titled under "Ross Milburn." In March, 1978, Milburn wrote Debbie Martin a letter confirming his involvement in the real estate business and telling her, "Paula and Ron will need money. So give them what they ask for." At about the same time as the conversation with the Goodales, the Throops and Ross E. Milburn conferred with their tax adviser about the tax consequences of constructing their home with cash, which led to the formation of the Creative Builders and P & R bank accounts. Shortly after this meeting, in April, 1978, the couples began purchasing lots in conformity with Milburn's plan.
 
 
 123
 We find that this evidence, although circumstantial, is sufficient to establish the existence of the conspiracy and of the couples' participation in it. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) ("a common purpose and plan may be inferred from a 'development and a collection of resources.' "); United States v. Leroux, 738 F.2d 943, 950 (8th Cir.1984) ("A course of action had already been established by independent evidence."). We recognize that Marion Milburn was not directly implicated in the conspiracy until after Paula Throop's statement to the Goodales. This does not bar admission of this evidence, however, for we have previously observed that "one charged with conspiracy may not avoid criminal responsibility by merely having had the fortuity or foresight to join a clearly illegal venture sometime after agreement concerning its objective was reached." United States v. Heater, 689 F.2d 783, 788 (8th Cir.1982) (citations omitted); Leroux, 738 F.2d at 949-50. Because the conspiracy was functioning at the time of Paula Throop's statement, we find her statement was made in the course of the conspiracy and that it binds all four appellants.
 
 
 124
 Paula Throop's statement also appears to have been made "in furtherance of" the conspiracy. This requirement for admissibility is construed broadly. United States v. Massa, 740 F.2d 629, 638 (8th Cir.1984); United States v. Bentley, 706 F.2d 1498, 1506 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). In evaluating the furtherance requirement, we consider the nature of the statement as well as the time and circumstances under which it was made. United States v. Handy, 668 F.2d 407, 408 (8th Cir.1982). Careful review of Goodale's testimony reveals that, on direct and cross-examination, he testified that Paula Throop disclosed the content of her telephone call to her husband for his information while the Goodales sat and listened. We have previously found that statements of explanation which reveal the progress of the conspiracy are made in furtherance of it. Massa, 740 F.2d at 638; Handy, 668 F.2d at 408. Paula Throop's statement to her husband undoubtedly informed him of new developments in the conspiracy, and thus furthered the concerted action. Therefore, we find no error in the admission of this testimony.
 
 
 125
 B. The TRO and Potential Due Process Defects.
 
 
 126
 The appellants raise essentially the same argument that Alan Milburn raised on this issue, and in our review of his appeal, we have discussed the relevant issues that are implicated by this argument. From our review of the record, we cannot find any sixth amendment violation. The district court declined to allow these parties to proceed in forma pauperis. The two couples retained their attorney from the outset and he appears to have defended them adequately. Finding no support to the contrary, we cannot say the temporary restraining order interfered with the couples' limited right to chosen counsel.
 
 
 127
 III. TERRY CRAFTON.
 
 
 128
 For reversal, Crafton argues that, in his conviction for cocaine distribution and conspiracy, the district court erred in refusing to grant his motion for severance and mistrial, that the district court erred in admitting certain evidence (taped conversations and telephone records), that there was an impermissible variance between the indictment and evidence of the overt acts in which Crafton was implicated, and that there was insufficient evidence supporting the charge of cocaine possession. We disagree on each point and affirm Crafton's conviction.
 
 
 129
 A. Motion for Severance and Mistrial.
 
 
 130
 Crafton maintains that the district court's failure to grant his pretrial motion to sever his trial from the trial of the other defendants exposed him to a risk of guilt by association because the jurors heard significant amounts of testimony involving the three Milburns and the Throops, which did not involve him.
 
 
 131
 Under Rule 14, Fed.R.Crim.P., if it appears that a defendant is prejudiced by a joinder, "the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Challenges under Rule 14, Fed.R.Crim.P. are committed to the trial court's discretion and are reviewed only for an abuse of that discretion. Id., United States v. Anthony, 565 F.2d 533, 538 (8th Cir.1977). Denial by the district court of a severance motion "will not be lightly overturned" and appellants bear "an extremely difficult burden" in showing an abuse of discretion. United States v. Werner, 620 F.2d 922, 928 (2d Cir.1980). In fact, this Court has held that
 
 
 132
 [t]o make a showing of prejudice, appellants must show more than merely that their chance for acquittal would have been better if they had been tried separately * * *. They must show that the joint trial resulted in such prejudice that a reasonable jury would not have concluded the way it did.
 
 
 133
 United States v. Bulgatz, 693 F.2d 728, 732 (8th Cir.1982), cert. denied, 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 444 (1983) (citation omitted).
 
 
 134
 The evidence of prejudice and abuse of discretion which Crafton adduces is insufficient to meet this burden. The fact that trial testimony dealt with the Milburns and Throops whose trials were subsequently severed does not document prejudice. The trials of the elder Milburns and the Throops were severed because they participated only in the tax fraud count of the indictment. The court granted Alan Milburn's motion for severance and mistrial because of the unintentional reference in an improperly edited tape to his previous conviction for marijuana distribution. The balance of the defendants--Crafton, Gary Darnall and Paula Lewis--were not involved in all counts of the indictment or all of the overt acts alleged, but the transactions and their roles in the series of transactions alleged were similar enough to justify the joint trial under Fed.R.Crim.P. 8(b). Moreover, evidence of marijuana sales and tax evasion was not unduly prejudicial because Count II of the indictment specified that disposition of the proceeds was an element of the conspiracy and because the participants in the marijuana scheme also conspired to sell the cocaine. Like the conspiracy at issue in United States v. Kaminski, 692 F.2d 505 (8th Cir.1982), the second count in this indictment apparently involves a "single, ongoing scheme" which "lends itself to a logical, compartmentalized analysis." Id. at 516. We find no suggestion that the jury was unable to compartmentalize defendants, charges, and supporting evidence, and we find no suggestion of abuse of discretion.[10]
 
 
 135
 B. Evidentiary Issues.
 
 
 136
 1. Admission of recorded conversations between Milburn and Humphries about Crafton.
 
 
 137
 Crafton argues that a taped conversation[11] between Milburn and Ron Humphries in which Milburn referred to Crafton was hearsay, and that its admission was highly prejudicial. Crafton concedes that the government's evidence may have established a conspiracy, but argues that none of the evidence established Crafton's connection to the conspiracy. We disagree.
 
 
 138
 As we have noted elsewhere in this opinion, Fed.R.Evid. 801(d)(2)(E) provides for the admission, as nonhearsay, of statements made "by a coconspirator of a party during the course and furtherance of a conspiracy." We have interpreted this rule to require the government to prove, by a preponderance of the evidence, that a conspiracy existed, that the defendant and declarant were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy. United States v. Jankowski, 713 F.2d 394, 396 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 732, 79 L.Ed.2d 192 (1984); United States v. Bell, 573 F.2d 1040, 1043 (8th Cir.1978).
 
 
 139
 The existence of the conspiracy has been demonstrated abundantly by evidence reviewed throughout this appeal, and we need not rehearse that evidence again. We find the point is bolstered, however, by the testimony we turn to in order to establish Crafton's membership in the conspiracy. Michael Richmond testified that in February, 1980, with Gary Darnall, he and Milburn met Crafton in Memphis and sold him twelve ounces of cocaine. Richmond also testified that Milburn had doubted the trustworthiness of one of his salesmen and had decided to deal directly with Crafton in his place. Mark McClellan testified that he drove to Kennett, Missouri, in August, 1980, and gave a bulky envelope weighing several ounces to Crafton in exchange for an envelope filled with cash. McClellan also testified that he had planned to meet Crafton in December, 1980, to deliver another bulky envelope, but Crafton did not appear. As we discuss below in III.B.2, Crafton's telephone records also corroborate his link to Milburn by confirming that calls were made on the day of the aborted cocaine sale with McClellan. Thus, the evidence clearly demonstrates the existence of a conspiracy of which Crafton was a member.
 
 
 140
 We also find that the statements admitted into evidence were made during the course of the conspiracy. Crafton was receiving deliveries until August, 1980, and had planned to receive a delivery in December, 1980. In addition, other recorded conversations confirm that Milburn had two pounds of cocaine ready for sale in February, that he had changed some of his personnel and purchased a "company car," and that he was planning the biggest deal of the year. By April, 1981, when the conversation in question occurred, the evidence confirms that the focus of the conspiracy had shifted to attempting to conceal the extent of the group's drug dealing.
 
 
 141
 Therefore, ample evidence demonstrates that the conspiracy was functioning actively and making future business plans until at least the time of the conversation challenged here. Other courts have found that conspiracies of this sort are presumed to exist until they are actually terminated:
 
 
 142
 [W]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated, and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn.
 
 
 143
 United States v. Hamilton, 689 F.2d 1262, 1268 (6th Cir.1982), cert. denied, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983).
 
 
 144
 See also United States v. Boyd, 610 F.2d 521, 528 (8th Cir.1979), cert. denied, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980) ("Mere cessation of activities is not enough [to constitute withdrawal from the conspiracy]."). In the evidence presented at trial, we find no indication either of Crafton's withdrawal or of his coconspirators' withdrawal. We find no indication that the drug conspiracy had ended; indeed, it had simply moved into the concealment phase, as we note immediately below. Accordingly, we conclude that the statement at issue was made in the course of the conspiracy.
 
 
 145
 We also find without hesitation that the challenged statement was made in furtherance of the conspiracy. Although not all federal courts have approved the admittance of statements made during the concealment phase of the conspiracy, e.g., Dutton v. Evans, 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970) ("The federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy * * *."), we believe logic and authority support our decision to admit the evidence. If the conspiracy had a single objective, once the conspirators had attained their objective, the conspiracy would, by definition, have expired. In cases like this one, however, where the conspiracy is a continuing arrangement that embraces a series of transactions, it is much more difficult to determine when the objectives have been attained and when the conspiracy has ended. Under similar circumstances, other courts have admitted statements from the concealment phase. United States v. Gleason, 616 F.2d 2, 23 (2d Cir.1979), cert. denied, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980) (statement made to allay suspicion of investigator admitted as being in furtherance of conspiracy); United States v. Del Valle, 587 F.2d 699, 703-04 (5th Cir.), cert. denied, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 274 (1979) (where conspiracy "was not aimed at accomplishing a single objective with a precise moment of termination" but "had a continuing series of objectives," acts of concealment "were parts of a continuing activity that was essential to and therefore in furtherance of the survival of an ongoing operation"). In this case, because the conspiracy was a series of loosely knit transactions between a changing cast of members, we cannot pinpoint when it may have ended, other than when its members were arrested. Therefore, we find that Milburn's acts of concealment were undertaken to preserve the conspiracy and foil attempts at detection. Because it met the tests prescribed by this Court, the evidence in question was properly admitted.
 
 
 146
 2. Telephone records of D.L. Crafton.
 
 
 147
 Crafton also objects to the admission of the telephone records of an account billed to D.L. Crafton of Jonesboro, Arkansas. These records were admitted to show that repeated telephone calls were made from the D.L. Crafton telephone to Alan Milburn and Susan Elayer, who were both indicted coconspirators. Crafton suggests that, because the government could not prove that the telephone belonged to him or that he made the calls, the evidence does not link him to the conspiracy and is not relevant.[12]
 
 
 148
 As we have noted before, relevant evidence is evidence that tends to make the existence of a pertinent fact more or less probable. Fed.R.Evid. 401. In addition, all relevant evidence is admissible. Fed.R.Evid. 402. Crafton is definitely linked to the location of the phone and to its use, which is relevant in that the evidence makes his involvement in the conspiracy more probable. To link Crafton to the residence, a Jonesboro police captain testified that he had known Crafton since he was born and that, since at least 1980, Crafton had lived at the address listed on D.L. Crafton's telephone records. Moreover, Crafton's link to the phone calls themselves was drawn by Mark McClellan, who testified that he unsuccessfully tried to meet Crafton for a cocaine sale in Blytheville, Arkansas, on December 1, 1980. On that date, two calls to Alan Milburn from a Blytheville pay phone were charged to the D.L. Crafton telephone account. McClellan's testimony, therefore, places Crafton in Blytheville, acting in furtherance of the conspiracy and the testimony amply corroborates Crafton's link to the D.L. Crafton telephone. See United States v. Atchley, 699 F.2d 1055, 1058 (11th Cir.1983) (approving the admission of telephone records to demonstrate appellant's link to a coconspirator).
 
 
 149
 C. Variance Between the Indictment and Evidence of Overt Acts.
 
 
 150
 Crafton argues that his right to a fair trial was infringed by variance between the indictment and evidence produced at trial. Specifically, he notes that the indictment alleged that he committed only one overt act in furtherance of the cocaine distribution conspiracy, while trial testimony proved one other actual overt act and two other aborted meetings. As a result, Crafton alleges that he was taken by surprise and his defense was misdirected.
 
 
 151
 The sixth amendment requires that the accused "be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI. This requirement serves due process by assuring that defendants have notice of the offense with which they are charged, and it enables defendants to anticipate and defend against the specified charges. In this case, the indictment specified that Crafton conspired with certain named and unnamed persons to distribute cocaine; the indictment specified the role that each of the named individuals occupied in the chain of distribution, and it specified one overt act in which Crafton was involved.
 
 
 152
 This Court has previously held that in conspiracy cases, the government is not limited in its proof to establishing the overt acts specified in the indictment. United States v. Ruiz-Altschiller, 694 F.2d 1104, 1109 (8th Cir.1982), cert. denied, 103 U.S. 3117, 77 L.Ed.2d 1371 (1983); United States v. Sellers, 603 F.2d 53, 56 (8th Cir.1979), vacated on other grounds, 447 U.S. 932, 100 S.Ct. 3033, 65 L.Ed.2d 1127 (1980), nor must the government prove every overt act alleged. Id. Where the indictment fairly specifies the offense charged and notifies the defendant of the particulars, the defendant has knowledge that other overt acts underlying the conspiracy might be pleaded at trial. United States v. Elliott, 571 F.2d 880, 911 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).
 
 
 153
 Under the circumstances of this case, therefore, we find no sixth amendment violation. The indictment placed Crafton on notice regarding the charges he faced and should have enabled him to construct his defense adequately.
 
 
 154
 D. Sufficiency of the Evidence Regarding Cocaine Possession.
 
 
 155
 Crafton also argues that the government only demonstrated that he purchased cocaine once or twice and failed to show that he had actually conspired with the others to distribute the cocaine. He contends that the evidence only suggests that he had purchased the cocaine for personal use. Thus, he maintains that the evidence is insufficient to support the jury's verdict of guilty of conspiring to distribute cocaine in violation of 21 U.S.C. Sec. 846. We disagree.
 
 
 156
 The evidence demonstrates that Crafton's cocaine possession occurred as part of the conspiracy. Michael Richmond testified that he saw Alan Milburn give Crafton "a bulk package of twelve ounces" of cocaine which Richmond and Milburn had carefully weighed by the quarter ounce on a gunpowder scale. This Court has previously found that a single purchase of between eight and sixteen ounces of cocaine "supports an inference or presumption that appellant knew that he was a 'part of a venture which extend[ed] beyond his individual participation. * * *.' " United States v. Prieskorn, 658 F.2d 631, 634-35 (8th Cir.1981) (citation omitted). See also United States v. Castellanos, 731 F.2d 979, 984-85 (D.C.Cir.1984) (inference of intent to distribute could be drawn from six ounces of cocaine, paraphernalia, and evidence of the drug's value); United States v. Hill, 589 F.2d 1344, 1350 (8th Cir.), cert. denied, 442 U.S. 919, 99 S.Ct. 2843, 61 L.Ed.2d 287 (1979) ("[A] jury can infer a defendant's intent to distribute from the quantity of drugs in the defendant's possession.").
 
 
 157
 Furthermore, Crafton's involvement is confirmed by Milburn's remarks to Richmond early in 1980 that he was going to eliminate middleman Michael Adkins and deal directly with Crafton, thereby reducing the degree to which the cocaine was diluted. In addition, Milburn's remark to Ron Humphries regarding his concern that Crafton might speak to the authorities suggests the need for secrecy regarding Crafton's involvement in the conspiracy. Coupled with the large quantity of Crafton's purchase, we find this evidence sufficient to support Crafton's conviction.
 
 
 158
 IV. GARY DARNALL.
 
 
 159
 Darnall argues that the evidence was insufficient to show that he possessed cocaine, that certain taped conversations were improperly admitted because they were not in the course and furtherance of the conspiracy, that he was prejudiced by the admission of evidence of previous drug sales, that the prosecution improperly implied that Darnall "could" get probation, that the district court improperly removed a juror, and that Darnall's conviction violated the Speedy Trial Act. We reverse on the sufficiency of evidence of possession but affirm his conviction on the conspiracy charge.
 
 
 160
 A. Sufficiency of the Evidence Regarding Darnall's Actual Possession of Cocaine.[13]
 
 
 161
 Darnall argues that the government's evidence was insufficient to demonstrate that he possessed cocaine in Missouri on December 24, 1980, as was charged in the superseding indictment. Specifically, Darnall argues that, although he possessed a briefcase that had just come from Florida and which, according to the group's custom and practice, might have contained cocaine, the government's evidence did not demonstrate beyond reasonable doubt that the briefcase contained the drug. We agree.
 
 
 162
 The government relies principally upon the testimony of Mark McClellan, Milburn's courier to Ralph Ed Purdy in Dallas and to Darnall in Fort Lauderdale, Florida. McClellan testified that he made repeated trips to both cities with a locked briefcase, usually carrying cash or cocaine. On the trip in question, McClellan testified that he drove to Florida early in December and stayed until December 23 because Darnall "said he wasn't ready to send [him] back. Things weren't together." McClellan testified that, during his stay, the two "got high," but he specified neither the drug, the date, nor the circumstances. The two men drove north together to Missouri for Christmas with the briefcase behind the seat of the truck. When the pair arrived in Sikeston, Darnall dropped McClellan off and kept the truck and briefcase when he went to his mother-in-law's house. McClellan said he was paid for this trip.
 
 
 163
 Although it is clear that the elements of a possession offense may be established by circumstantial evidence, United States v. Vergara, 687 F.2d 57, 61-62 (5th Cir.1982), the evidence adduced here is insufficient to demonstrate Darnall's possession of cocaine on the relevant date. Perhaps most important, no cocaine was seized, tested, or even seen by government agents or by McClellan. Although McClellan's behavior (traveling to Florida and back with a locked briefcase) conforms to the pattern which governed the previous transactions that were in evidence, this trip differed in certain particulars. McClellan's long stay, awaiting the cocaine, implies that the cocaine might never have arrived, and that the two simply traveled north for the holidays without the cocaine. The fact that Darnall accompanied McClellan on the trip also distinguishes it from past practice; Darnall's presence eliminates the need for a courier and suggests the absence of drugs. Finally, the absence of testimony about sampling the cocaine reduces the certainty that any of the drugs arrived. Thus, the case resembles United States v. Suarez, 487 F.2d 236, 240 (5th Cir.1973), cert. denied, 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974), in which the defendant was convicted for heroin possession, despite the fact that no evidence established that he carried heroin from the house in the paper bag which he had when agents watched him. The government's inability to prove that defendant Chiong had heroin, coupled with the fact that another man had carried a paper bag in and out of the house during the same time period, caused the Court to conclude that
 
 
 164
 the government's evidence failed to eliminate all reasonable doubt that Chiong's paper bag contained heroin. Chiong may be guilty, but that is not the standard.
 
 
 165
 Id. at 240.
 
 
 166
 Because we are unpersuaded that Darnall's conviction for possession of cocaine in Missouri, on December 24, 1980, with intent to distribute is supported by sufficient evidence, we reverse on that count. Although Darnall does not challenge the sufficiency of the evidence underlying his conspiracy charge, he challenges other evidentiary rulings and procedural defects which we discuss below.
 
 
 167
 B. Evidentiary Issues Relating to the Conspiracy Charge.
 
 
 168
 1. The admissibility of recorded conversations between Milburn and Humphries about Darnall.
 
 
 169
 Like Crafton, Darnall challenges the admissibility of conversations between Milburn and Humphries. As we noted earlier, Humphries became a government informant and visited Milburn wearing a microphone to record the conversations. Darnall challenges under Fed.R.Evid. 801(d)(2)(E) the admission of conversations that occurred on February 6, February 11, and April 10, 1981. Because the transcripts of these tapes are too long to be reproduced here, we shall simply refer below to specific portions of those conversations as we discuss their admissibility.
 
 
 170
 Elsewhere in this opinion, we have repeatedly elaborated the prerequisites for the admissibility of evidence under Rule 801(d)(2)(E). Darnall does not contest any inadequacy in the government's showing of the existence of the conspiracy or of Darnall's membership in it. Nevertheless, this opinion and the trial record are replete with evidence of the existence of the conspiracy, and we are satisfied, from our review of the record and the evidence that we discuss in resolving this argument, that Darnall was a member of this conspiracy.
 
 
 171
 Next, we consider whether Milburn's remarks to Humphries were made in the course of the conspiracy. We believe they were. Darnall suggests that they were not in the course of the conspiracy because the duration of the conspiracy is determined according to the last overt act of the group, which, according to the indictment, was February 10, 1981, the date of the second conversation. In fact, a conspiracy expires after the last overt act committed during the existence of the conspiracy. Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946). The relevant overt acts need not be alleged in the indictment, however, so long as the indictment gives proper notice of the conspiracy charge. Not only is it not necessary that the indictment enumerate all of the underlying overt acts that are adduced at trial, United States v. Ruiz-Altschiller, 694 F.2d 1104, 1109 (8th Cir.1982), but the indictment need not even contain a conspiracy count for evidence to be admitted under Rule 801(d)(2)(E). United States v. Kiefer, 694 F.2d 1109, 1112 n. 2 (8th Cir.1982); United States v. Richardson, 477 F.2d 1280, 1283 (8th Cir.), cert. denied, 414 U.S. 843, 94 S.Ct. 104, 38 L.Ed.2d 82 (1973). As we indicate below, we are satisfied, from direct and circumstantial evidence, that the conspiracy functioned at least through the April 10, 1981, conversation.
 
 
 172
 Darnall also suggests that Milburn's remark on April 10 to Humphries that the conspiracy had ended ("Hey, we've quit. Gary and I have decided to lock it up.") shows the termination of the conspiracy and confirms the inadmissibility of this evidence under the coconspirator exception of Rule 801(d)(2)(E). Aside from the inconsistency of Darnall's position, which urges the admission of this evidence to show its inadmissibility, we find that this suggestion is without merit. Even were we to regard this statement as evidence of the conspiracy's expiration, it would not rise to the threshold necessary to establish a bona fide withdrawal from the conspiracy. To withdraw effectively, the defendant must demonstrate "that he took affirmative action to defeat or disavow the purpose of the conspiracy. * * * The '[m]ere cessation of the activity in furtherance of the conspiracy does not constitute withdrawal.' " United States v. Garrett, 720 F.2d 705, 714 (D.C.Cir.1983). See also United States v. Boyd, 610 F.2d 521, 528 (8th Cir.1979), cert. denied, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980). Without stronger evidence of termination, continuing conspiracies of this nature are presumed to continue until there is an affirmative showing of termination. United States v. Hamilton, 689 F.2d 1262, 1268 (6th Cir.1982), cert. denied, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). Thus, even without the evidence we rely on here, the continuity of this conspiracy is presumed.
 
 
 173
 Not only does Milburn's single remark ("we've quit") fail to meet the standard for withdrawal, but, in context, its import is utterly unclear. The remark is in response to Humphries' concern that Milburn should stop using his telephone because telephone records are potentially damaging evidence. In the same breath, Milburn tells Humphries that he will be in Seattle for a month in June, "if [he] can stay out of jail that long," which could be construed as an attempt to evade the pressure of the investigation, or as a "mere cessation of activities." Id. In any event, Milburn devotes much of the conversation to discussing the progress of the investigation ("They've been to see Mark McClellan. They've been to see Richard Milburn. They've been to see Susan's [Elayer] parents."), advice to Humphries on how to stonewall the investigation ("If they ask you questions, you go 'I don't know what those people do.' Everybody nuts up. Nobody, nobody talks."), and attempts to allay Humphries' fears of detection ("They won't find out a thing, hear, 'cause they don't have any cocaine."). As we note below, all of these remarks are in furtherance of the conspiracy and suggest that the conspiracy was fully functioning as of April 10.
 
 
 174
 The evidence supporting the continued existence of the conspiracy is strong, albeit circumstantial. United States v. Fischel, 693 F.2d 800, 802 (8th Cir.1982). Perhaps most important, the conversations of February 6 and 11 actually accompanied controlled cocaine purchases through Humphries. Although no evidence confirms actual cocaine distribution after February 11, ample evidence demonstrates a pattern of continued activity akin to the pattern of transactions alleged in Count II of the indictment (particularly Milburn's efforts to "recruit, organize, supervise, manage, and terminate" conspiracy personnel and Milburn's travels and meetings with coconspirators). On March 12, 1981, Milburn's brown Pontiac Bonneville (which he described to Humphries as his "company car") was seen in Fort Lauderdale, parked in front of Darnall's home. A month later, on April 10, 1981, Darnall was seen in Sikeston, driving the 1977 Thunderbird which Darnall and Milburn had purchased with cash in Michael Richmond's name for transporting the cocaine. In addition, telephone toll records through April, 1981, prove regular and extensive contract between Milburn, Darnall, Crafton and Ralph Ed Purdy. Given this evidence and the legal presumption we have outlined above, it seems clear that all three of Milburn's conversations with Humphries were uttered in the course of the conspiracy.
 
 
 175
 We reach a similar result in deciding whether the recorded conversations were made in furtherance of the conspiracy. Darnall suggests that, because Humphries had become an informer when these conversations took place, he could not conspire with Milburn and the remarks could not have been uttered in furtherance of the conspiracy. This argument is inapplicable to the facts in the case at bar. As we observed before, the fact that one conspirator allies himself with the government has no effect on the continuing conspiratorial efforts of his former associates who remain at large. United States v. Smith, 600 F.2d 149, 153 (8th Cir.1979). Furthermore, as the Sixth Circuit has observed, where "the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting 'under the direction and surveillance of government agents to obtain evidence against the coconspirators.' " Hamilton, 689 F.2d at 1269.
 
 
 176
 Several courts of appeals have approved remarks similar to Milburn's in statements in furtherance of a conspiracy. Statements of reassurance which "serve to maintain trust and cohesiveness * * *, or inform each other of the current status of the conspiracy" are admissible. United States v. Ammar, 714 F.2d 238, 252 (3d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). In addition, statements identifying a fellow coconspirator, United States v. Handy, 668 F.2d 407, 408 (8th Cir.1982), or identifying a coconspirator as a source of narcotics, United States v. Lambros, 564 F.2d 26, 30 (8th Cir.1977), are admissible. Also admissible are statements designed to induce a coconspirator to act. Ebeling v. United States, 248 F.2d 429, 437 (8th Cir.1957).
 
 
 177
 The February 6 and 11 conversations undoubtedly include remarks admissible under these standards. Humphries and Milburn discussed personnel problems with certain members of the cocaine ring, the availability and quality of up to two pounds of cocaine, and the possibility of Humphries working for Milburn in exchange for debt forgiveness. On April 10, Milburn allays Humphries' fears about the DEA investigation and details his efforts to evade detection. He instructs Humphries to keep silent when he goes before the grand jury, and reminds him that the entire group has agreed to remain silent, thereby attempting to preserve the cohesiveness of the group. Under the prevailing interpretations of Rule 801(d)(2)(E), therefore, the taped evidence was properly admitted.
 
 
 178
 2. Evidence of Darnall's prior marijuana and cocaine sales.
 
 
 179
 Darnall also argues that he was prejudiced by the admission of evidence that he and Milburn worked together on a series of marijuana sales from 1977-79, a period of time antedating the crimes charged in the indictment. We disagree.
 
 
 180
 Under Rule 404(b), Fed.R.Evid., evidence of other crimes is admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. This Court has previously enunciated the standard governing the admissibility of this kind of evidence: (1) it must be relevant to a material issue other than the character of the defendant; (2) it must be clear and convincing; and (3) its probative value must not be substantially outweighed by the danger of the unfair prejudice. United States v. Gomez, 733 F.2d 69, 72 (8th Cir.1984); United States v. Turpin, 707 F.2d 332, 336 (8th Cir.1983).
 
 
 181
 Count II of the indictment charged that Darnall conspired with six others "willfully and knowingly" to distribute cocaine. This Court has previously held that "[w]here specific intent and guilty knowledge are elements of the crime charged, evidence of related criminal activity tending to establish those elements is generally admissible." United States v. Gocke, 507 F.2d 820, 824 (8th Cir.1974), cert. denied, 420 U.S. 979, 95 S.Ct. 1407, 43 L.Ed.2d 660 (1975). More specifically, this Court and others have admitted evidence of prior drug sales in subsequent drug prosecutions. See United States v. Evans, 697 F.2d 240, 247-49 (8th Cir.), cert. denied, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983) (similar previous drug transactions were relevant to show defendant's motive and intent); United States v. Lippner, 676 F.2d 456, 461-62 (11th Cir.1982) (similar previous drug conspiracy involves same conspiratorial intent and is therefore admissible); United States v. Lewis, 423 F.2d 457, 459 (8th Cir.), cert. denied, 400 U.S. 905, 91 S.Ct. 146, 27 L.Ed.2d 142 (1970) ("In prosecutions for violations of narcotics laws, the defendant's complicity in other similar narcotics transactions may serve to establish intent or motive to commit the crime charged.").
 
 
 182
 By introducing evidence of the prior dealings between Darnall and Milburn, the government was able to demonstrate Darnall's intent and knowledge regarding both their agreement and the nature of their objective.[14] Thus, the evidence was relevant to a material issue.
 
 
 183
 The other standards governing admissibility also appear to have been met. The evidence, as presented through government witness Ron Humphries, was clear and convincing. Finally, we note that its probative value was not substantially outweighed by undue prejudice. The colloquy regarding marijuana sales and the supporting document were a brief part of a long and complex trial. The district court offered to receive a limiting instruction on this point, which defendant waived. Finally, it appears that the district court conducted the proper balancing test by hearing arguments of counsel out of the jury's presence. Under the circumstances, we cannot find abuse of the trial court's discretion, and we conclude that the evidence was properly admitted.
 
 
 184
 C. Issues in the Conspiracy Charge Regarding Darnall's Jury.
 
 
 185
 1. The prosecution's implication to the jury that Darnall "could" get probation.
 
 
 186
 Darnall maintains that he was prejudiced by an improper statement made by the prosecutor during his closing argument.[15] Specifically, he suggests that the prosecutor's implication that Darnall "could" receive probation may have improperly induced the jury to convict Darnall. We find this argument to be without merit.
 
 
 187
 This Court has previously held that trial courts are vested with broad discretion in controlling closing arguments. United States v. McCaghren, 666 F.2d 1227, 1232 (8th Cir.1981). This Court will reverse only on a showing of abuse of discretion. McCaghren, 666 F.2d at 1232; United States v. Young, 618 F.2d 1281 at 1289 (8th Cir.1980). We review the prosecutor's comments in the context of the entire trial, United States v. Davis, 557 F.2d 1239, 1245 (8th Cir.1977), to determine "whether the argument complained of was so offensive as to deprive the defendant of a fair trial." McCaghren, 666 F.2d at 1232.
 
 
 188
 No abuse of discretion or deprivation of a fair trial inheres in the passage cited by Darnall. In context, the prosecutor's words are no more than a balanced description of the sentencing process and we find no overreaching or attempt to influence the jury with improper inferences.
 
 
 189
 2. Removal of juror number 8.
 
 
 190
 Early in the trial, the government discovered that one juror had not responded honestly to the court during voir dire in that she had not disclosed that she was the mother of a clerk's office employee. In proceedings outside the presence of the jury, the court proposed to excuse her at the end of the day and to replace her with an alternate juror. Only Darnall objected to this procedure, and he now argues that this was an abuse of discretion which compels a retrial. We cannot agree.
 
 
 191
 Fed.R.Crim.P. 24(c) provides that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Darnall complains that the district court erred by failing to inquire into the original juror's qualifications. We note, however, that decisions to excuse a juror for cause are committed to the sound discretion of the trial judge and his decision will be upheld if there exists "a sound basis" for his decision. United States v. Yonn, 702 F.2d 1341, 1346 (11th Cir.1983); United States v. Peters, 617 F.2d 503, 505 (7th Cir.1980).
 
 
 192
 Although the district court did not question the juror on the record about her failure to answer his question correctly, we believe the United States Attorney's statement on the record, coupled with the consent of the other defendants and with Darnall's failure to specify any basis on which his client might suffer prejudice, constitutes an adequate record to support the replacement of the juror.
 
 
 193
 D. The Speedy Trial Act.
 
 
 194
 Darnall also argues that he was denied his right to a speedy trial in violation of 18 U.S.C. Sec. 3161(c).[16] Specifically, he suggests that the district court improperly relied on 18 U.S.C. Sec. 3161(h)(7)[17] and because the district court improperly granted a continuance without making proper findings. We find no merit to these arguments.
 
 
 195
 A brief chronology may be necessary to understand Darnall's arguments. On August 20, 1982, the initial indictment charged Darnall and ten others with the crimes for which they were tried. Within four days, all the defendants except Darnall had been arrested and most were arraigned within a week. On September 2, 1982, the grand jury returned a superseding indictment, and within two weeks all of the defendants had been arrested and arraigned. Trial was set for October 4. On the court's own motion and on the other defendants' two requests, the trial was continued until March 7, 1983. Throughout this period, DEA agents had attempted to locate Darnall, who was subsequently found in the Florida state correctional system where he had been imprisoned on state charges of cocaine delivery. The government sought and received a Writ of Habeas Corpus Ad Prosequendum, and Darnall appeared before a magistrate in Missouri on December 13, 1982. At Darnall's arraignment, trial was set for February 7, 1983. Subsequently, the government sought to join Darnall's trial with that of his codefendants, set for a month later, and the district court granted the motion.
 
 
 196
 Based on our reading of the statute, the relevant date for computation of the seventy-day period is December 13, 1982, the date on which Darnall appeared before a judicial officer of the Eastern District of Missouri. 18 U.S.C. Sec. 3161(c)(1) (1982). The applicability of the Speedy Trial Act boils down, then, to Darnall's three specific arguments, considered from that date.
 
 
 197
 First, Darnall attacks the district court's decision to join him with his codefendants, and thereby exclude from the seventy-day computation period the delay pending that joint trial. Darnall complains that this reading of the statute allows the government to join defendants whose trials violate the seventy-day limit with other defendants who have waived their rights under the Speedy Trial Act. Although this is an ingenious argument, we find no support for it in the law. Cf. United States v. Fogarty, 692 F.2d 542, 546 (8th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1434, 75 L.Ed.2d 792 (1983) ("an exclusion applicable to one defendant applies to all codefendants."), citing United States v. Edwards, 627 F.2d 460, 461 (D.C.Cir.), cert. denied, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1982). The district court simply followed the statute which plainly excludes "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. Sec. 3161(h)(7). The statute guards against the abuse of which Darnall complains by limiting the delay to a "reasonable period" and by functioning subject to the usual standards which govern joinder under Fed.R.Crim.P. 8.
 
 
 198
 Another ingenious argument which we also reject is Darnall's suggestion that, when the government urged the trial court to set Darnall's trial separately from his codefendants, it implicitly requested and received a motion for severance. We cannot impute this intention either to the government or to the district court. The scheduling letter on which Darnall relies was that and nothing more. Motions for severance are entirely discrete from scheduling matters and we decline to assimilate the two.
 
 
 199
 Finally, Darnall argues that the district court's grant of continuance was improper because it did not state the explicit reasons underlying its decision to grant the continuance, as the statute requires. 18 U.S.C. Sec. 3161(h)(8)(A). While strict adherence to this principle is undoubtedly the better practice, we decline to elevate form over substance and to reverse Darnall's conviction over a fourteen-day delay where the district court essentially conformed with the statute. In its order, the district court stated its conclusion ("The ends of justice served by granting such continuance outweigh the best interests of the public and the defendant in a speedy trial."), and this factual determination is entitled to deference by this Court. In addition, the underlying facts of the case supporting this conclusion were practically self-evident. United States v. Guerrero, 667 F.2d 862, 866 (10th Cir.1981), cert. denied, 456 U.S. 964, 102 S.Ct. 2044, 72 L.Ed.2d 490 (1982) ("The circumstances were so obvious that the court could not fail to have taken judicial notice of those facts."). By granting a continuance, the district court could consolidate Darnall's trial with that of his ten codefendants. The evidentiary and procedural complexity of this large trial certainly justified the continuance, United States v. Brooks, 697 F.2d 517, 521 (3d Cir.1982), cert. denied, 460 U.S. 1071, 103 S.Ct. 1526, 75 L.Ed.2d 949 (1983), particularly in light of the brevity of the delay. Accordingly, we find no error.
 
 
 200
 V. PAULA LEWIS.
 
 
 201
 Paula Lewis argues that the evidence was insufficient to support her conviction for cocaine distribution and that the district court erred in failing to grant her motion for severance or mistrial. Because we agree that the evidence was insufficient to support a conspiracy charge, we need not reach the severance issue.
 
 
 202
 As we have noted in this opinion, in a challenge to the sufficiency of the evidence, the jury's verdict must be sustained if there is substantial evidence, viewed in the light most favorable to the government, to support it. United States v. Grego, 724 F.2d 701, 704 (8th Cir.1984).
 
 
 203
 To convict a defendant of conspiracy, the government must demonstrate that there was an agreement among the defendants to achieve some illegal purpose. Id. This Court has previously held that "it is not necessary to prove that the defendant knew all of the conspirators or was aware of all the details, but it must show that the person 'knowingly contributed * * * efforts in furtherance of it.' " United States v. Jones, 545 F.2d 1112, 1115 (8th Cir.1976), cert. denied, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977) (citation omitted). Perhaps most succinctly, the Fifth Circuit has held that "there must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew of it, and with that knowledge, voluntarily became a part of it." United States v. Bland, 653 F.2d 989, 996 (5th Cir.), cert. denied, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); United States v. Littrell, 574 F.2d 828, 832 (5th Cir.1978).
 
 
 204
 Although the evidence amply demonstrates the existence of the conspiracy, we find insufficient proof of Lewis's knowledge of and knowing participation in the conspiracy. The only evidence that the government was able to adduce suggests that Paula Lewis delivered cocaine to Ron Humphries once by herself and another time with her boyfriend, Gary Darnall. Alicia Dalton Buchanan (Humphries' girlfriend) also testified that Lewis met her in a Macon, Georgia, motel to deliver cocaine. Motel receipts confirm this meeting. No evidence demonstrates, however, that Lewis had any knowledge of the conspiracy or its unlawful objective, or that she even knew she was delivering cocaine. On these points, Lewis's case differs sharply from Crafton's, discussed above. The government may have had evidence it did not introduce or it may have had sufficient evidence to convict Lewis of a different charge, but this record does not bear out Lewis's involvement in the conspiracy.
 
 
 205
 Accordingly, because the evidence is insufficient, we reverse Paula Lewis's conviction.VI. CONCLUSION.
 
 
 206
 Therefore, for the reasons set forth in this opinion, we affirm the convictions of Ross Alan Milburn, Ross E. Milburn, Marion Milburn, Ron Throop, Paula Throop and Terry Crafton; we affirm Gary Darnall's conviction for conspiracy but reverse his conviction for possession of cocaine; and we reverse Paula Lewis's conviction.
 
 
 
 [1]
 Milburn's father, Ross Emory Milburn, is also a defendant-appellant in this case. The record reflects that the younger Milburn uses his middle name, Alan, to distinguish him from his father, who uses his full name. Because the son is more prominent in this appeal, we generally refer to him by last name; references to the elder Milburn will be by his full name
 
 
 [2]
 We also note that the district court explicitly declined to predict probable success on the merits by crossing out language to that effect on the order. Although this is not necessary to meet the Rule 65 requirements, it strengthens the inference behind the district court's use of "might" in the passage quoted above
 
 
 [3]
 Accord United States v. Ray, 731 F.2d 1361, 1365 (9th Cir.1984) (non-indigents have a qualified right to choose counsel); United States v. James, 708 F.2d 40, 44 (2d Cir.1983) (right to chosen counsel for non-indigent is a right "of constitutional dimension"); Ford v. Israel, 701 F.2d 689, 692 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 1114, 78 L.Ed.2d 114 (1983) (state may not arbitrarily deny a non-indigent chosen counsel); United States v. Phillips, 699 F.2d 798, 801 (6th Cir.), overruled on other grounds; 733 F.2d 422 (1983) (right to chosen counsel for solvent defendants not absolute, but is an "essential component" of the sixth amendment); United States v. Dinitz, 538 F.2d 1214, 1219 (5th Cir.1976), cert. denied, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977); United States v. Inman, 483 F.2d 738, 739-40 (4th Cir.1973), cert. denied, 416 U.S. 588, 94 S.Ct. 2394, 40 L.Ed.2d 766 (1974)
 
 
 [4]
 We note that the Sixth and Ninth Circuits have held that forfeiture orders are appealable interlocutory matters because the constitutionality of the seizure is a matter separate from and collateral to the issue of the defendant's guilt. United States v. Ferrantino, 738 F.2d 109, 110 (6th Cir.1983); Spilotro, 680 F.2d at 615
 
 
 [5]
 We find no significance in the fact that Milburn alone was charged with the CCE violation. Other Courts have held that property held by third parties is subject to forfeiture under the CCE statute on a showing that they are part of the profits of the CCE. United States v. Raimondo, 721 F.2d 476, 478 (4th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984) (forfeiture of wife's and attorney's property upheld where evidence supports the inference that they were aware the property was derived from drug profits); United States v. Murillo, 709 F.2d 1298, 1300 n. 2 (9th Cir.1983) ("The interest of one who received the property from the defendant with knowledge of the government's claim may be adversely affected." See United States v. Long, 654 F.2d 911, 915-16 (3d Cir.1981) (court finds probable cause supports preliminary restraint of airplane which defendant signed over to law firm to pay legal bills)
 We also find that the loan records are probative of Milburn's involvement in light of his admissions to Humphries, quoted elsewhere in this opinion, that he had covered his tracks by suggesting his father had saved or borrowed funds sufficient to build the houses.
 
 
 [6]
 The government prepared a summary exhibit comparing the so-called "Paula" page (which listed Milburn's loans to Paula Throop) in Debbie Martin's drug ledger with currency deposits in the P & R account to correlate the two and verify the net worth theory. Milburn objects to this use of summary exhibits as an abuse of the net worth theory
 Summary exhibits are explicitly authorized by Fed.R.Evid. 1006; this Court has found them particularly useful to help triers of fact understand complex factual issues. Boston Securities, Inc. v. United Bonding Ins. Co., 441 F.2d 1302, 1303 (8th Cir.1971). The charts or summaries and any assumptions that they include must be based upon evidence in the record. United States v. Diez, 515 F.2d 892, 905 (5th Cir.1975), cert. denied, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976). The trial judge is vested with discretion to determine whether the exhibits shall be sent to the jury. United States v. Wilson, 665 F.2d 825, 829-30 (8th Cir.1981), cert. denied, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982).
 The financial transactions summarized in this case appear to be supported by the evidence and the exhibits themselves do not appear to have taken on undue significance at trial. Cf. Baines v. United States, 426 F.2d 833, 839-40 (5th Cir.1970). In addition, the district court appears to have foreseen the potential for prejudice inherent in summary exhibits and accordingly instructed the jury that the summaries were used solely out of an interest in convenience, and that the summaries were not evidence in themselves. See Diez, 515 F.2d at 905-06 (approving a similar instruction). We find no error.
 
 
 [7]
 Elayer and Ralph Ed Purdy pled guilty to prior charges and are not a part of this appeal
 
 
 [8]
 The only other reported CCE case in the Eighth Circuit is United States v. Samuelson, 697 F.2d 255, 259 n. 4 (8th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1983), in which the North Dakota District Court imposed a fifteen-year sentence on the principal of a continuing criminal enterprise dealing with cocaine
 
 
 [9]
 Actually, the two were never married
 
 
 [10]
 Our explanation of the severance issue in large part also resolves Crafton's argument regarding the mistrial. He suggests that a mistrial should have been granted because the severance of Alan Milburn reduced much of the relevance of the previously introduced hearsay. We deal with this argument at greater length below in III(B)(1) in our discussion of the coconspirator hearsay exception. We note here, however, that Milburn was named as a coconspirator in count II, in which Crafton was charged
 
 
 [11]
 Although Crafton's attorney represented in his brief that four such conversations were admitted against his client, careful review of the record confirms that only one of them was admitted into evidence. We reproduce the challenged testimony here
 What they've done, they've taken all my phone records, requisitioned those, and they've, ah, gone down every list and taken the numbers, found out who * * * to, and goin' around. I've already called Frank and Terry Crafton * * *. Everybody is straightenin' up, tightenin' up, and nobody's talkin'.
 
 
 [12]
 Crafton does not challenge the admissibility of records themselves under Fed.R.Evid. 803(6), so we do not address any potential hearsay problems
 
 
 [13]
 Because we reverse Darnall's possession conviction, we need not consider his additional argument regarding a jury instruction on the situs of the crime
 
 
 [14]
 It was not necessary for the government to await defendant's denial of intent or knowledge before introducing this evidence; instead, the government may anticipate the defense and introduce it in its case-in-chief. Evans, 697 F.2d at 248 n. 8, citing United States v. Jardan, 552 F.2d 216, 219 (8th Cir.), cert. denied, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977)
 
 
 [15]
 The allegedly improper statement to the jury at issue comes from the following paragraph. We emphasize the portion to which Darnall objects
 McClellan and Humphries made a deal with the Government; there's no question about it. They pled guilty and they walked before you as convicted felons. Much will be made of the fact, no doubt, that they are on probation. I expect, also, that Judge Hungate will instruct you this morning that punishment under our system of justice is a matter for the court, not the jury. Those individuals went before a judge; he looked at the particular merits of their situation and the court assessed the punishment given to Humphries and McClellan, just as the Judge will instruct you will happen or could happen in this case. [Emphasis added.]
 
 
 [16]
 Post-indictment delay is also examined under the sixth amendment according to the criteria announced in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which, applied on an ad hoc basis, include length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id. at 530, 92 S.Ct. at 2192. In Barker, the Supreme Court directed that we consider length of delay a "triggering mechanism" with the result that, unless there is some delay that is presumptively prejudicial, we need not inquire further into the other factors. Although we decline to specify a precise point at which delay becomes presumptively prejudicial, we believe the approximately seven-month delay between the original indictment and the commencement of trial to be within acceptable limits of expedience. See United States v. Struyf, 701 F.2d 875, 878-79 (11th Cir.1983) (seven-month delay acceptable); United States v. Varella, 692 F.2d 1352, 1359 (11th Cir.1982), cert. denied, Gavin v. United States, 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1392 (1983) (four-month delay acceptable); United States v. Arkus, 675 F.2d 245, 248 (9th Cir.1982) (six-month delay acceptable)
 
 
 [17]
 This section provides, in pertinent part, for a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. Sec. 3161(h)(7) (1982)